## CITY AND COUNTY OF SAN FRANCISCO v. TRANSBAY CONST. CO.

### No. 10168.

Circuit Court of Appeals, Ninth Circuit.

March 19, 1943.

Rehearing Denied June 1, 1943.

John J. O'Toole, City Atty., and Dion R. Holm and Henry Heidelberg, Deputy City Attys., all of San Francisco, Cal. (Maurice E. Harrison, of San Francisco, Cal., of counsel), for appellant.

Samuel S. Stevens and Heller, Ehrman, White & McAuliffe, all of San Francisco, Cal. (Sidney M. Ehrman, of San Francisco, Cal., of counsel), for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

This suit involves a contract between Transbay Construction Company and the City of San Francisco for the elevation of the O'Shaughnessy Dam, a structure erected by the city a number of years ago on the Tuolumne River in Yosemite National Park.[1] Jurisdiction is conferred by diversity of citizenship.

As originally constructed, the dam was of the arched gravity type with a height of 226 feet above stream bed and a length of 600 feet across the canyon through which the Tuolumne flows. The city desired to raise the height of the dam 85 feet. On December 7, 1934, proposals to construct the addition were invited. On January 24, 1935, Transbay submitted its bid, which, being the lowest, was accepted. The bid was on the basis of unit prices covering numerous items, much the largest of these being for concrete and cement. A substantial but smaller item was that of excavation for the dam foundation. Upon the award to Transbay in April 1935, a contract was entered into between it and the city.

We need mention but a few of the provisions of this exhaustive contract and of the specifications which form part of it. In the information for bidders, which was part of the contract, it was required that the bidder "inform himself by careful personal examination" and by such other means as he might think proper, of the actual conditions and requirements of the work and as to any unusual difficulties that might be encountered in its prosecution. It was stated that the amount of work to be done under each item had been preliminarily estimated, the estimate to be used as a basis for comparing bids. The contract provided, however, that in respect of work or materials for which unit prices were prescribed there was no agreement by the city that the amount thereof "will correspond even approximately to this estimate," the city reserving the right to increase or decrease the amount of any class or portion of the work as in its opinion might be to the city's interest. The contractor was required to bear all losses resulting to him because the nature of the ground might prove different from that assumed or expected, or on account of unforeseen difficulties.

It was provided that the contractor should complete all work within 730 days after service of notice to proceed, a penalty of $400 being assessable for each day beyond the period. There were provisions for extensions without penalty in event of unavoidable delay, but the contractor was required to give written notice of such de-

---

[1] The city's activities with respect to the waters impounded there are governed by the Raker Act, 38 Stat.L. 242.

lay and apply for extensions. He was to receive no compensation or damages for delays whether avoidable or unavoidable.

The amount of work or materials included under each item was estimated in a table of estimated quantities, the estimate for the item of excavation for dam foundation being 30,000 cubic yards. The unit price bid for excavation was $2.75 per yard. Costly delays in completing this phase of the work inspired the present litigation.

On May 14; 1935, notice was given Transbay to proceed. On July 17 of that year drilling was commenced for the excavation in the canyon walls. On the basis of the preliminary estimate, the excavation work would have been completed by November 1, 1935; but in order to reach a firm foundation further excavation was required by the engineers,[2] ultimately a total of 84,000 cubic yards being removed. The additional excavation was apparently ordered from time to time in piecemeal fashion with the result that the contractor was subjected to very substantial delay, a large part of which we assume could have been avoided by a measure of diligence on the part of the engineers speaking for the city. The vacillating conduct of the engineers in this respect gave rise from time to time to verbal protests on the part of Transbay. The excavation for the foundation was not actually completed until July 25, 1936.

On August 7, 1936, Transbay made written application to the city, under the terms of the contract, for an extension of time. The ground alleged was that unavoidable delays had occurred as the result of the additional excavation. The application stated that "due to the unforeseen condition of the rock, underlying the surface, which was pronounced by the Engineers to be unsatisfactory for the foundation, we were ordered by the Engineers to excavate further." The application concluded with the statement that the "unavoidable delays between November 1, 1935, and July 25, 1936, total 236 calendar days." An extension of that number of days was requested "within which to complete" the contract. The extension was granted and Transbay proceeded with the major work of pouring concrete. The latter work had already commenced April 30, 1936. Later on there were two other extensions, each for 90 days, each being granted upon Transbay's statement that further unavoidable delays had occurred. The contract was completed and accepted by the city on July 1, 1938, at which time Transbay was paid the full unit contract prices, amounting in the aggregate to $3,457,000.69.[3]

Meanwhile, on November 25, 1936, Transbay wrote the city protesting against the increased amount of excavation as a departure from the terms of the contract, and stating that it reserved the right to claim additional compensation by reason of the unreasonable increase. This, it will be noted, was four months after the completion of the excavation work. Because of its bearing on the legal aspects of the case, the letter is copied in full on the margin [4].

[2] In the interest of public safety the State Engineer of Dams made requirements in respect of deepening the rock cuts, and in these requirements the city acquiesced.

[3] On the basis of the original estimates of quantities the bid was for a total of $3,219,965, or about $238,000 less than the amounts ultimately paid.

[4] "November 25, 1936
"Dear Sirs:
"Reference is made to the contract entered into between the undersigned, Transbay Construction Company, and the Public Utilities Commission of the City and County of San Francisco for the enlargement of O'Shaughnessy Dam, and to the plans and specifications relating to said contract, and in particular to the estimate of quantities contained in the specifications, which shows the amount of the excavation for the Dam foundation to be 30,000 cubic yards.

"Your attention is called to the fact that during the progress of the work, the engineer representing the City and County of San Francisco has, from time to time, issued orders to the undersigned to increase the amount of the excavation for the Dam foundation, so that at the present time the contractor has been required to excavate approximately 85,000 cubic yards. The increase in the rock excavation has resulted in a material and substantial departure from the terms and provisions of the contract entered into between said parties and contemplated to be performed by the undersigned, and because of such additional excavation the cost of said work has been and will be materially and substantially increased, and the undersigned has suffered and will hereafter suffer great and substantial damage and injury by reason of such increase in the rock excavation. It is impossible at the present time to es-

On October 7, 1938, Transbay filed a claim against the city for $450,464.56 for damages for various delays in completion which were said to have increased overhead costs. These asserted delays consisted of the major one relating to excavation, plus minor delays in grouting.[5] Payment of the claim was refused by the city. The present action was commenced shortly thereafter.

The complaint contained three counts or causes of action. The first count was for damages for breach of contract in the amount for which claim had previously been filed as above stated. In a bill of particulars furnished the city the total claim for damages was reduced to $386,227.14. It was alleged in this count that because of the unreasonable increase in the amount of excavation and because of the delay in performance of the contract caused by the city, the plaintiff had been put to additional costs in the maintenance of its plant and equipment, and in such items as interest, insurance, overhead expense, maintenance of roads, etc., for an additional period of approximately one year, to the damage of the plaintiff in the sum mentioned.

The second cause of action was for $4,-291,628.28, said to be the reasonable value of labor and materials furnished the city. It was alleged that the city had made partial payment on this account, leaving a balance owing of $834,627.59. The third cause of action was for the same amount, asserted to be owing as the balance of "the agreed value" of labor and materials furnished. Thus the first cause of action was predicated on the theory of breach of contract, whereas the second and third appear to proceed on implied or quasi contract or on the notion that the express contract between the parties had been abrogated or rescinded.

On the trial the court denied recovery on the first cause of action because of the failure of Transbay to present its claim for damages within sixty days, as required by § 87 of the city's charter. This provides that all claims for damages against the city must be presented to the comptroller within sixty days after the occurrence from which it is claimed that damages have arisen. It will be recalled that the project was completed and accepted on July 1, 1938, whereas the claim for damages was not presented until October 7 of that year. Transbay did not claim error in the dismissal of its first cause of action, and has not appealed therefrom. The applicability and binding force of the charter provisions are conceded. See Haigh v. City of Los Angeles, 139 Cal.App. 595, 599, 34 P.2d 779.

However, the court, although holding that there was no misrepresentation or bad faith on the part of the city, reached the conclusion that the contract in its entirety should be deemed abrogated and Transbay permitted to recover on a quantum meruit basis.[6] Accordingly the second cause of

timate in full the amount of such damage and the additional cost to the undersigned by reason of the change and modification in said contract.

"By reason of the foregoing the undersigned respectfully protests against the orders increasing the rock excavation beyond the approximate amount shown on the specifications and takes this opportunity to notify you that it has proceeded and will proceed with the performance of the work required by the plans and specifications which has been and will be done, after such increases in rock excavation were ordered, only under protest. The undersigned further advises you that it has accepted and will accept additional payments, according to the unit prices specified in the contract and in the specifications for the work to be performed, only under protest, and that in continuing with said work and accepting progress payments from time to time the undersigned does so under protest, and reserves the right to claim additional and

further compensation by reason of the unreasonable increase in the rock excavation and the modification of the original contract caused by such increase.

"The undersigned further respectfully advises you that it intends to claim all additional compensation to which it may be legally entitled by reason of the modification and change in said contract, both with respect to the work heretofore done and hereafter to be done by it in connection with the performance of said contract.

"Yours very truly,

"Transbay Construction Company,

"By Ralph T. Keenan."

[5] Grouting was done when the main job was finished and any added expense incident to delay in the performance of this work was inconsequential. The damage claimed for delay in grouting was less than $6,000.

[6] The court stated that "circumstances unanticipated by the parties made radical changes in the character and amount

action was referred to a master to receive evidence of the amount owing as the reasonable value of labor and materials furnished in the course of the entire project. The third count was dismissed. · On the reference, the master determined that Transbay was entitled to the sum of $3,-862,049.12 as the reasonable value of labor and materials, plus a profit of 10% thereon, or a total of $4,248,254.03. Credit was given for the amount already paid, so that the net sum awarded was $791,253.34. The master's report was approved by the court over the city's objection. Findings were thereupon made and judgment entered for the amount of the award. This appeal followed.

The judgment appears unsupported by reason or authority. It is of course arguable, as the city contends, that the delays giving rise to the damage were contingencies provided against in the contract; and that while Transbay became entitled as of right to extensions of time there could be no monetary recovery beyond exaction of the stipulated unit prices. As to this, however, we need not inquire. We assume for the purpose of decision that the method of performance imposed on the contractor in the respects indicated was so unreasonable as to amount to a breach of contract. The situation of the parties will be considered on that assumption.

■ Thus Transbay might have treated the contract as rescinded, ceased work thereunder, and sued for the value of labor and materials furnished to the date of the breach justifying the rescission. But we agree with Transbay that this was not the only course it might take without waiver of its rights. It might, we think, elect to proceed with the contract, advising the city of its election and reserving its right to claim damages for the unjustifiable delays suffered at the hands of the city. That Transbay in fact elected to pursue the latter course is evidenced. by its going ahead with the main project of raising the dam, by its applications for extensions of time, by its letter of protest, by its claim presented to the city, and by the content of the first count of its bill of complaint. Had the claim for damages been timely presented, we suppose that Transbay would have been entitled to judgment in some amount on its first cause of action. But having proceeded with the contract, Transbay was not thereafter at liberty to treat it as nonexistent and recover for the entire job on a cost plus basis. There is no reason whatever for supposing that it was entitled to relief of that kind, since the legitimate losses it sustained were adequately compensable in damages.

■ The suit is governed by local law. The California Civil Code, § 1688, provides that a contract is extinguished by its rescission. Section 1691 of the Civil Code states: "Rescission, when not effected by consent, can be accomplished only by the use, on the part of the party rescinding, of reasonable diligence to comply with the following rules: 1. He must rescind promptly, upon discovering the facts which entitled him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right * * *." This statute has been strictly applied by the California courts. Wills v. Porter, 132 Cal. 516, 521, 64 P. 896; Brown v. Domestic Utilities Mfg. Co., 172 Cal. 733, 159 P. 163; see California Farm & Fruit Co. v. Schiappa-Pietra, 151 Cal. 732, 91 P. 593.

Transbay does not question the force of the local rule; indeed it does not even claim to have rescinded. Its position is that the entire contract should in law be deemed "abrogated" because of "radical changes" brought about in the course of its performance. Presumably the radical changes have to do with the extensive excavation consuming nearly eight months of time beyond that anticipated. But Transbay has not here contended that it was unreasonable for the city to insist upon the excavation of this large yardage. It could not well do so if the plain terms of the contract are to be given any force at all. Its contention is that its costs were unreasonably increased by delays unjustly imposed upon it in the doing of this and one other item of construction. By such an argument we are asked to believe that a project totally different from that contemplated by the agreement was foisted on the contractor, as though having contracted to erect one type of structure he was required to build another and different structure.[7] The argument has little but its fervor to recommend it.

of the work to be performed under the contract, greatly increasing the expense thereof," and that "it would be unjust to permit defendant to strictly enforce the contract against plaintiff." 35 F.Supp. · 433, 436.

[7] Cf. Salt Lake City v. Smith, 10 Cir., 104 F. 457.

The authorities on which Transbay chiefly leans are a line of New York cases commencing with Lentilhon v. City of New York, 1905, 102 App.Div. 548, 92 N.Y.S. 897. The leading case in this group is Borough Const. Co. v. City of New York, 1910, 200 N.Y. 149, 93 N.E. 480,[8] 140 Am. St.Rep. 633. The latter decision was cited with approval by an intermediate appellate court of California in Gogo v. Los Angeles County Flood Control Dist., 1941, 45 Cal. App.2d 334, 114 P.2d 65.

The doctrine of these cases is that a contractor who is ordered by representatives of a municipality to furnish materials or do work which the former believes are not called for by his contract, may under protest do as directed and subsequently recover damages if he is able to show that the requirement imposed on him was not fairly within his contract.[9] Under such circumstances the contractor may treat the insistence of the municipality as a breach and recover damages based upon the reasonable value of the extra work or materials. These cases are not authority for the proposition that if the contractor chooses to continue, the contract is to be regarded as rescinded or abrogated. The recovery in quantum meruit goes only to the work performed in excess of that called for by the agreement. These decisions represent an enlightened development of the law of contracts. They support recourse to either of the two alternatives heretofore discussed, and which we have assumed were open to appellee; but they lend no color to the notion that the entire contract is for all purposes to be treated as out of the window.

The case of Gogo v. Los Angeles County Flood Control Dist., supra, involved a misrepresentation as to the amount and character of work to be required of the contractor. The latter, after discovery of the misrepresentation, continued the work under protest. The court thought that his doing so did not constitute a waiver of the right to recover damages for the misrepresentation.[10] This decision affords no authority for what was done below. Nor does it contain any intimation that if portions of the work have been misrepresented

the contractor may elect to continue and subsequently recover for all work on a quantum meruit basis. Other authorities cited by Transbay need not be reviewed. They are substantially in harmony with the cases already analyzed.

Reversed.

---

[8] Another case in the group is Beckwith v. City of New York, 1912, 148 App.Div. 658, 133 N.Y.S. 202.

[9] The rule is subject to the limitation that the question whether the thing required is embraced in the contract must be fairly debatable.

[10] For a similar holding see Palmberg v. City of Astoria, 101 Or. 224, 199 P. 630, 16 A.L.R. 1125.