UNITED STATES of America for the Use
and Benefit of WARREN PAINTING
CO., Inc., Appellant,

v.

J. C. BOESPFLUG CONSTRUCTION CO.
and Travelers Indemnity Co.,
Appellees.

No. 18570.

United States Court of Appeals
Ninth Circuit.

Nov. 18, 1963.

D. A. Burr, G. F. Boney, and Theodore M. Pease, Jr., Anchorage, Alaska, for appellant.

Hughes, Thorsness & Lowe, and Richard O. Gantz, Anchorage, Alaska, for appellee.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

HAMLEY, Circuit Judge.

This is a suit, brought under the Miller Act, § 2, 49 Stat. 794 (1935), 40 U.S.C. § 270b (1958), to recover compensation for work performed in the construction of a government facility near Anchorage, Alaska. The action was brought on behalf of Warren Painting Company, Inc. (Warren), painting subcontractor on the project. The general contractor, J. C. Boespflug Construction Co. (Boespflug), and the surety on the general contractor's payment bond, Travelers Indemnity Co., were named defendants.

Three claims were stated in the complaint, one of which involved asserted additional work necessitated by the unsatisfactory condition of the plaster surfaces. Recovery in the sum of $20,092.-74 was sought under this claim. Plaintiff appeals from that part of the judgment which disallowed this item. Defendants cross-appeal, contending that certain time cards and other documents offered by plaintiff in proof of damages, were erroneously received in evidence.

Boespflug was the prime contractor for the construction of a seven-story hospital at Elmendorf Air Force Base, on the outskirts of Anchorage. It awarded a subcontract for painting to Warren. Warren's subcontract, entered into on April 29, 1953, called for completion of its work by July 1, 1955.

By October, 1954, the plastering subcontractor had completed the plastering of the ground floor of the hospital, and Warren began the painting of that area. So many structural and radial cracks in the plaster were discovered at this time that Warren wrote to Boespflug, under date of October 20, 1954, stating that application of the first coat of paint did not constitute acceptance of the surface by Warren.[1] The presence of these cracks

---

1. It is the practice for painting contractors such as Warren to prepare the surfaces for painting by first patching, with a broad knife, minor hairline cracks in the plaster. However, it is generally considered to be the responsibility of the plasterer to repair structural and radial cracks. Cracks of this kind are relatively large and must be grooved before being filled. Oftentimes the extent of the cracking is

was apparently due in part to an earthquake which had occurred early in October, 1954, and in part to the poor quality of the plastering job.

By December, 1954, most of the plastering had been completed. On December 10 of that year a second earthquake occurred, with consequent additional damage to the plastered surfaces. Testimony offered in behalf of Warren indicated that the patching by the plastering contractor was insufficient and, as a result, Warren was required to chop out and replace plaster around structural cracks. The trial court found that Warren performed certain repairs to the plastered surfaces "which were in a damaged and unsatisfactory condition, as more particularly set forth in Paragraph VIII of Plaintiff's Amended Complaint." [2]

The Court further found:

"That the plastering had been previously installed by another subcontractor and was in such a condition as to prevent the Plaintiff from performing its subcontract work in accordance with the applicable painting specifications."

As a result of the circumstances described above, a controversy developed between Warren and the plastering subcontractor. On January 18, 1955, Warren wrote to Boespflug complaining of the method being used by the plastering subcontractor in patching major cracks. In another letter to Boespflug, written on the same day, Warren suggested roller stippling as a part of the paint application, indicating, however, that this operation would add an additional cost. Roller stippling is the application of a very heavy coat of paint by the use of brushes, which coat is then "rolled" out with a roller stipple.[3]

Boespflug replied, on February 25, 1955, that the roller stippling method had been accepted by the government inspector, at no additional cost to the government.[4] On March 1, 1955, Warren wrote to Boespflug, advising that Warren did not intend to stipple the walls unless the plans and specifications were amended to provide for such application and additional compensation was provided by the government or other parties. In this letter, Warren also stated that if painting were to be done in accordance with present specifications, it would not proceed

---

not visible until after a prime-sealer coat of paint has been applied. The painting contractor is nevertheless presumed to have accepted the surface when he applies the first coat of paint, unless he indicates at that time that he is not accepting the plaster.

2. As no amended complaint was filed, the trial court must have been referring to the original complaint, paragraph VIII of which reads in pertinent part:
    "That, when the use plaintiff commenced performance of its contract, the plastered surfaces of said building were in a damaged and unsatisfactory condition, and the plaintiff was unable to proceed in accordance with its painting contract. That the plastering installed by other subcontractors of the defendant was in such condition as to prevent the use plaintiff from performing its subcontract work in accordance with applicable painting specifications."

3. In this letter Warren did not explicitly indicate to Boespflug that the stippling was necessary in order to cope with

structural and radial cracks in the plaster or improper repair of such cracks by the plastering subcontractor. The reason given in the letter for suggesting that roller stippling be employed was that as "a plastered surface seems to present difficult problems in Alaska," the suggested method would "give a more satisfactory surface," and "better the job." A witness for Warren testified, however, that roller stippling was suggested because the cracks in the plaster would show through three coats of paint applied in the ordinary manner called for by the specifications.

4. Boespflug further stated in this letter to Warren:
    "You had been advised before this time that there would be no extra paid for this change, but this advise [sic] was disregarded by your force.
    "We can only accept your letters of 18 January 1955 and delivered 21 February 1955, as a means of trying to cover up the fact that you proceeded to act in this matter without going through the proper channel."

with painting until notified by the government or Boespflug that the plaster is acceptable and that Warren should proceed with the painting.[5]

Having received no response to this letter by March 15, 1955, Warren on that date again wrote to Boespflug, indicating that it was awaiting a directive to proceed, a notification from the government that the plaster work was acceptable, and a decision concerning the stippling of walls. In this letter Warren stated that unless such advice were received by March 29, 1955, it would not be possible to meet the painting completion date of July 1, 1955. At a conference with Boespflug officials held on March 26, 1955, a representative of Warren orally reiterated the position stated in Warren's letters of March 1 and 15, 1955.

On March 26, 1955, following this conference, Boespflug wrote to Warren, advising that it regarded Warren's statement that it would do no more painting until it received notice from the government or Boespflug that the plaster was acceptable, and a directive to proceed with the painting, as a breach of contract. Warren was told in this letter that Boespflug would not furnish such a directive and would not request the government to do so. Boespflug called upon Warren to repudiate its statement referred to above by March 29, 1955, advising that unless this were done, Boespflug would consider that Warren had breached its contract and would ask the latter's bonding company to take over completion of the painting subcontract.[6]

Further conferences were had and, on March 28, 1955, Warren advised Boespflug in writing that the extra cost involved in doing the stippling would be $8,321.07. There is no indication that Boespflug agreed to this figure, or agreed to pay any amount above that called for in the contract, to cover the cost of stippling or the cost of plaster repairing performed by Warren.

Three days later, on March 31, 1955, Warren advised Boespflug that a solution of the controversy had been reached as a result of a conference with the plastering subcontractor. Under this arrangement Warren would request a change order permitting the stippling without charge to the government or change of contract price. The plastering subcontractor would contribute the sum of $2,500 in payment of the anticipated additional costs, and Warren would absorb the balance of any additional costs entailed by the stippling. But Boespflug was also advised in this letter:

"This modification, if acceptable to the Government, is made with reservation of the position which we assumed with respect to acceptance of the existing surface. Thus, in accordance with the fourth paragraph of the letter of March 26th, we are not waiving any claims that we may have that arise by reason of future conditions of the plaster."

The plastering subcontractor thereafter agreed in writing to contribute the $2,500 called for by his understanding with Warren,[7] and the government ap-

---

5. In this letter Warren made it clear that the stippling method was considered necessary because of the improper way in which cracks and defects in the plaster were being repaired by the plastering subcontractor.

6. In this letter, Boespflug also stated: "As your representative was advised in our conference we do not desire in any way to attempt to deprive you of any contractural [sic] right which you have under your subcontract agreement or are we willing to modify such contractural [sic] obligations in any respect except by written agreement and in the manner provided by your subcontract. Since, your Mr Warren seemed much concerned in our conference that the placing of the primer coat upon the plaster walls would be construed to be a waiver of the exceptions taken by you to the method of plaster repair we are willing to agree that no such waiver will be claimed from such act on your part. We do not, however, agree to your contentions or relieve you from any responsibility now imposed upon you by the subcontract."

7. This agreement by the plastering subcontractor took the form of a letter to

proved the change in specifications to permit stippling. The work then proceeded for a time without further controversies with regard to extra work for plastering repairs. There was testimony, however, that after March 31, 1955, many cracks in the plaster opened up again, or were not filled properly by the plastering contractor, and had to be repaired by Warren. Plaster repairs by the plastering subcontractor continued until the fall of 1955.

On May 19, 1955, Warren wrote to Boespflug stating that sizable portions of plastered areas were, at the request of the government, being removed and replastered. In this letter, Warren also stated that the painting of the repaired and plastered walls necessitated many man hours in redoing painting work that had been completed, and that the cost of doing such work "must be reimbursed to the Warren Painting Company." The record does not indicate that this letter drew any response from Boespflug.

On January 26, 1956, Warren sent Boespflug a bill in the amount of $20,092.74 for "(b)ack charges to plastering contractor for patching work performed by our crews." This bill was supported by a list detailing the hours of labor spent on particular days, the cost thereof, and associated taxes, insurance costs, health and welfare deductions, and overhead. As revealed by this supporting data, the

work for which additional compensation was claimed, was performed between March 2 and October 22, 1955.

On February 1, 1956, Warren wrote to Boespflug making claim for $22,624.97, it being asserted that $20,124.97 of this amount was for patching and repairing plaster beyond normal repairs. The remaining $2,500.00 of the $22,624.97 claim represented the sum the plastering contractor had promised to contribute to the cost of stippling, but which Warren had not yet received. In this letter Warren stated that the claim was made on the basis of Boespflug's letter of March 26, 1955, and Warren's reply of March 31, 1955, these assertedly constituting "the memorandum of our agreement."

Boespflug thereafter paid Warren the $2,500.00 the plastering subcontractor had agreed to contribute to the cost of stippling. The prime contractor, however, refused to pay the balance of the claim. This action was then commenced.

The principal ground upon which the trial court disallowed Warren's $20,124.97 claim was that Warren failed to prove that it complied with the terms and provisions of paragraph 12 of the painting subcontract. This paragraph, the pertinent part of which is quoted in the margin, specifies the procedures to be followed where the subcontractor desires to make a claim against the prime contractor for extra work or damages.[8]

---

Boespflug, dated April 26, 1955, in which it was said:

"Kindly be advised that we agree to deduct $2500.00 from our contract price on the above mentioned project, for stippling of the plaster surfaces plus the fact that the painter will do all necessary remaining patches caused by normal problems."

8. "12. Claims for Extra Work or Damages. No claims for extra work or on account of changes under this Contract will be recognized or paid for unless agreed to in writing before the work is done or the changes made, in which writing shall be specified in detail the extra work or changes desired, the price to be paid or the amount to be deducted, should said change decrease the amount to be paid hereunder; PROVIDED, HOWEV-

ER, that in the event the Owner, or Owner's representative shall require or direct Contractor to proceed with extra work or changes under the Prime Contract in advance of determination of price or deduction therefor, or in the event Contractor and Subcontractor are unable to agree promptly upon the price or deduction for any extra work or change, and any such extra work or change relates to the work to be done under this Subcontract Agreement, the Subcontractor shall proceed, nevertheless, to perform such extra work or carry into effect such change or changes notwithstanding the lack of previous agreement upon price or reduction in price, and in such event, the price or reduction in price shall be subject to later determination and agreement between Contractor and Subcontrac-

With regard to this holding, Warren contends, alternatively, that there was compliance with the provisions of paragraph 12, Boespflug waived this provision of the contract, and Boespflug prevented Warren from complying with this provision.

The opening clause of paragraph 12 provides that no claim for extra work under the contract will be recognized or paid unless agreed to in writing before the work is done or the changes made, "in which writing shall be specified in detail the extra work or changes desired, the price to be paid or the amount to be deducted. * * * "

■ There was no written agreement of this kind covering the extra work for which Warren seeks compensation, nor do we find anything in the history of this transaction, as reviewed above, which indicates that Boespflug either waived compliance with that provision of paragraph 12, or prevented Warren from complying with it.

But, as the proviso to paragraph 12 indicates (see note 8), there can be circumstances under which the subcontractor is entitled to perform extra work in the expectation that he will be compensated therefor, despite the lack of a previous agreement on price.

One of the two specified circumstances of this kind is where the "Owner" (government) shall require or direct the prime contractor to proceed with extra work or changes under the prime contract in advance of determination of price or deduction therefor.

■ This provision contemplates circumstances under which the owner and prime contractor acknowledge that the work in question is extra work for which the subcontractor will be entitled to additional compensation. None of the work performed by Warren for which compensation was sought in this suit was performed under these circumstances. Neither the government nor the prime contractor has at any time acknowledged that any of this work performed by Warren was extra work for which Warren was entitled to compensation.

The second specified circumstance, described in the proviso to paragraph 12, is where the contractor and subcontractor are unable to agree promptly upon the price for any extra work or change, and such extra work or change relates to the work to be done under the subcontract.

This provision contemplates circumstances under which the contractor requires the subcontractor to do the work in question, which work relates to the work to be done under the subcontract, and which the subcontractor believes to be extra work for which he is entitled to compensation, but with regard to which the parties are unable to agree upon the price. Failure to agree upon a price may be due to the contractor's view that the work in question is not extra work for which the subcontractor is entitled to additional compensation, but is work called for under the subcontract.[9]

tor, and in default thereof, the price or reduction in price shall be determined by the Owner's representative, but in the event of extra work, to not exceed the amount received by Contractor therefor less Contractor's overhead and profit, and in the event of a deduction in price to be more than the amount deducted from Contractor's price. Any claim for damages of any nature whatsoever shall be deemed waived by Subcontractor unless written notice thereof is given the Contractor within ten (10) days after the date of its origin."

9. If this second specified circumstance were construed to require that the con-tractor and subcontractor agree in advance that the work directed to be done is extra work for which the subcontractor is entitled to additional compensation, the subcontractor could be faced with a very serious quandary. For example, if the contractor required certain work to be done, contending that it was called for by the contract, either the subcontractor would have to perform the work without hope of additional compensation notwithstanding a later judicial determination that it was extra work, or he would have to refuse to perform and run the risk of being declared in default and of losing in a later action to sustain

We need not decide whether any of the work performed by Warren in repairing cracks in plaster, and utilizing painting methods not called for by the contract in order to cover such cracks, was performed under the specified circumstances now under discussion. Even if it were, Warren is not entitled to compensation therefor because, as to this work, there was a failure to comply with the notice requirements of paragraph 12, a matter to be discussed below.

■ To be separately considered, however, is the repainting which Warren did after May 9, 1955. This work was done because the government caused certain painted plaster to be removed and new plaster applied. In our opinion this was work not called for by Warren's subcontract, although related thereto. It was work which, under all of the circumstances, Warren was entitled to believe the prime contractor required him to do. It was therefore extra work which, under the second specified circumstance described in the proviso of paragraph 12, Warren was entitled to do in the expectation that he would receive compensation therefor, notwithstanding the lack of a previous agreement as to price. This is on the assumption, of course, that there was compliance with the notice provision of paragraph 12, and that Boespflug has no other defense which precludes recovery.

■ In reaching the conclusion just stated with regard to the applicability of the proviso of paragraph 12, we have not overlooked paragraph 4 of the subcontract. Under paragraph 4 the prime contractor disclaims responsibility for any damages "due to delays or interference" with the work of the subcontractor resulting from the acts or operations of other subcontractors. Warren's claim to compensation for this repainting is predicated upon conditions which resulted from the fact that the plastering contractor did unsatisfactory work. In this sense it can be said that the claim is based on "interference" by the plastering subcontractor.

But the latter's unsatisfactory work would not have necessitated any repainting by Warren had not Boespflug insisted that Warren proceed with the painting after Warren called attention to serious defects therein, necessitating later removal of plaster at the direction of the government. This being the case, we do not believe that the provisions of paragraph 4 of the contract preclude this claim against Boespflug.

■ Nor have we, in reaching the conclusion stated with regard to the application of the proviso of paragraph 12, overlooked paragraph 23 of the contract. It is therein provided, in part, that the subcontractor agrees to receive the payment specified in the subcontract as full compensation for doing all work including all loss or damage from "any unforseen difficulties or obstructions which may arise or be encountered in the prosecution of the work. * * *" In our opinion, this provision was not intended to relieve the prime contractor from the obligation to pay for extra work necessitated by the prime contractor's demand that paint be applied on defective plaster.

It was stated above that, by reason of the proviso of paragraph 12, Warren was entitled to compensation for the described repainting, assuming there was compliance with the notice provision of paragraph 12, and assuming that Boespflug has no other defense which precludes recovery.

The notice provision, contained in the last sentence of the part of paragraph 12 quoted in note 8, requires that written notice of any claim for damages be given to the prime contractor within ten days "after the date of its origin," or the claim is waived.

___

his position. As we read this contract provision, the subcontractor would not be faced with such a dilemma as to work which the contractor requires him to perform. There must still, of course, be compliance by the subcontractor with the notice provision contained in the last sentence of paragraph 12, a matter to be discussed later in this opinion.

■ Warren contends that its letter of March 31, 1955, and its prior correspondence constitute such a notice. We do not agree. All correspondence prior to March 31, 1955, was set aside by Warren's letter of that date. It was therein stated, in effect, that in consideration of $2,500 to be received from the plastering subcontractor, Boespflug would not be charged for extra work performed up to that time, nor for the cost of future stippling necessitated by the condition of plastering already in place.

In Warren's letter of March 31, 1955, it was further stated that any claims that Warren "may have that arise by reason of future conditions of the plaster," were not waived. We interpret this to mean claims based on the condition of plaster placed in the future, i. e., after March 31, 1955. In any event, this disclaimer of waiver as to future claims could not be regarded as a written notice of a claim for damage within the meaning of paragraph 12, since it had reference only to possible future damage.

But on May 19, 1955, Warren wrote to Boespflug, calling attention to the fact that sizable portions of plastered areas in various parts of the building were then being removed and replastered at the request of the government. Boespflug was therein notified that the painting of these repaired and plastered walls, then in progress, necessitated many man hours in redoing work that had been completed, and "the cost of doing such work must be reimbursed to the Warren Painting Company."

■ In our opinion, this letter constituted, with respect to the kind of extra work described, written notice of a claim for damages within the meaning of paragraph 12. Giving effect to the ten-day provision, Warren therefore complied with paragraph 12 with respect to extra work of the kind described, performed on and after May 9, 1955. Warren is not entitled to reimbursement for extra work of a different kind, or extra work of the same kind performed prior to May 9, 1955, because as to such work there was a failure to comply with the notice provision of paragraph 12.[10]

The only other defense offered by Boespflug which the trial court took into account in rendering its decision was that the extra work performed by Warren inured to the benefit of the plastering subcontractor, and not to Boespflug or its surety. The trial court accepted this defense as one basis for disallowing the claim in question. As appears from that part of the trial court's memorandum opinion which is quoted in the margin, the view that Warren must prove that the extra work inured to the benefit of Boespflug was predicated on the idea that this was, essentially, an action in *quantum meruit*.[11]

10. The proviso of paragraph 12 states that if a price determination is necessary it shall be made by the owner's representative. Since Boespflug did not raise this point in the trial court or here, we will assume that the owner's representative refused to make such a determination, or failed to make it within a reasonable time, or the parties mutually waived this provision.

This proviso also states that, in the event of such a price determination, the price so determined may not exceed the amount received by the prime contractor therefor, less the latter's overhead and profit. Since Boespflug did not rely on this limitation as to amount either in the trial court or here, we will assume that it concedes this provision to be inapplicable to extra work of the kind here in question. This is also our opinion, since the provision that the subcontractor shall be compensated for extra work performed under the circumstances described in the proviso would be illusory if applied to extra work not involving extra units for which the prime contractor was itself being compensated.

11. The court said, in its memorandum opinion:
"Furthermore, plaintiff has failed to prove its claim against the defendant upon the theory of *quantum meruit* or unjust enrichment as it appears that any work performed by the plaintiff in patchwork plastering inured to the benefit of the plastering subcontract and not the defendant. There is no showing that the defendant Boespflug in anywise stood to suffer under its prime contract by reason of the plasterer's default."

There may have been observation made during the trial or in the trial briefs, which misled the district court into believing that the theory of the action, or an alternative theory, was *quantum meruit*. Actually, however, the claim rests upon the subcontract.

■ Establishment of a subcontractor's claim for labor or materials, in an action brought under the Miller Act, is not dependent upon a showing that the labor or materials furnished were of benefit to the prime contractor. All that is required is proof that the labor or material was furnished in the prosecution of the work provided for in the prime contract, and that the subcontractor has not been paid therefor. See § 2(a), 49 Stat. 794, 40 U.S.C. § 270b(a).

It is therefore immaterial whether Boespflug benefited by the extra work for which Warren claims compensation.

In dealing with the issues of this case we have considered, but have found it unnecessary to discuss herein, the numerous decisions cited by the parties. The resolution of these issues has called for an understanding of the facts of this case, and an interpretation of the contract here in question. Court decisions involving other facts and different contracts have not proved particularly helpful.

■ On the cross-appeal we hold that, because of alterations in the documents, the time cards and related compilations should not have been received as business records under 28 U.S.C. § 1732.[12] On the further proceedings, these documents may be received if the alterations are deleted and the documents are restored to their original condition, or if, in the case of alterations which do not obliterate the original entries in the documents, it is understood that the alterations will not be considered as evidence.

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

12. We need not decide whether it was necessary for appellee to take a cross appeal in order to raise this point.