**SEABOARD SURETY CO.**, a corporate entity, etc., et al., Appellants,

v.

**UNITED STATES** of America for Use and Benefit of C.D.G., INC., a corporate entity, Appellee.

No. 19644.

United States Court of Appeals
Ninth Circuit.

Jan. 17, 1966.

Rehearing Denied March 15, 1966.

**140**

William E. Fitzpatrick, Peter A. Lewi, Los Angeles, Cal., for appellants.

David Daar, Los Angeles, Cal., for appellee.

Before HAMLEY and JERTBERG, Circuit Judges, and JAMESON, District Judge.

JAMESON, District Judge:

This is an appeal from a judgment for $112,338.39, plus interest from July 24, 1961, in favor of a subcontractor against the prime contractor and its surety for work and labor performed on a Capehart housing project. The district court concluded that it had jurisdiction under Title 28 U.S.C. § 1352.[1] This court's jurisdiction is based upon 28 U.S.C. § 1291.

The prime contractor, a joint venture known as Desert Builders,[2] entered into a written contract with the United States, through the Department of Navy, for the construction of 150 units of Capehart residential housing at the Marine Corps base, Twenty-Nine Palms, California. As required by the Capehart Act, 42 U.S.C. § 1594(a), Desert Builders and Seaboard Surety Company executed two payment bonds covering the two mortgage areas into which the project had been divided to facilitate financing.

On October 10, 1960, appellant Desert Builders, as prime contractor, entered into a subcontract with appellee, C.D.G., Inc., whereby the subcontractor agreed to furnish all labor and equipment necessary to complete the rough and finish

---

1. Title 28 U.S.C. § 1352 reads: "The district courts shall have original jurisdiction, concurrent with State courts, of any action on a bond executed under any law of the United States."

2. The joint venture was composed of D & L Construction Co., Oscar Watson, doing business under the firm name and style of O & J Construction Co., and T. A. Loving & Co.

carpentry work for the 150 units. The contract excluded the furnishing of materials. The total contract price was $150,092.[3]

C.D.G. commenced performance on or about February 9, 1961. On or about July 24, 1961, the subcontract was terminated by Desert Builders. Desert Builders thereafter completed the work. C.D.G. subsequently instituted suit for the reasonable value of its work and labor. Desert Builders counterclaimed for the cost of completing the contract in excess of the amount alleged to be due C.D.G.

The district court found that C.D.G. performed the work called for in its subcontract until it was terminated by Desert Builders and that the termination "was wholly without justification and excuse". At the time of termination C.D.G. had completed approximately 70 per cent of its subcontract.

The court further found, inter alia:

(1) The failure of Desert Builders, within a reasonable time, to "wrap the structures with tarpaper and material preliminary to lathing, resulted in allowing the work of plaintiff to remain exposed to the hot, dry desert weather, thereby causing excessive warping, twisting and splitting" of both loose lumber and lumber in place in the unwrapped structures, this weather damage requiring use plaintiff, without its fault, to do substantial rework and extra work.

(2) Desert Builders' failure to deliver windows, door frames, and related materials permitted warping, twisting, splitting, and damage to C.D.G.'s completed work, requiring rework and extra work, without C.D.G.'s fault.

(3) C.D.G. was delayed in its work by the failure of Desert Builders to provide lumber for the construction of the project satisfactory to the Navy and Navy inspectors regularly condemned lumber furnished by Desert Builders. This caused delay and substantial increase in C.D.G.'s costs.[4]

(4) Desert Builders failed to adequately and reasonably coordinate the arrival and delivery of materials and the work of following trades, thereby causing C.D.G. extra work.

(5) All extra work and rework were requested by Desert Builders and done for their benefit and were required by Desert Builders before they would pay C.D.G. for its regular work under the subcontract.

(6) C.D.G.'s workmanship was at times of poor quality, especially at the beginning of the project, but improved and was satisfactory at other stages of the project. Many interruptions and delays were not C.D.G.'s fault and made it difficult for C.D.G. to maintain an efficient crew.

(7) Desert Builders was responsible for 75 per cent of the cost of all excessive work on the project, and 25 per cent of the excessive work was the result of C.D.G.'s poor workmanship and supervision or "problems not chargeable to defendants".[5]

The district court found further that the total cost to C.D.G. was $187,223.91 and that this amount "wholly and sub-

---

3. The total contract price consisted of rough carpentry with siding $130,000; addendum No. 1 (part of rough carpentry) $1,342; and finish carpentry $18,750.

4. In its memorandum opinion the district court stated that it appeared from the evidence that the Navy was not justified in condemning the lumber, but nevertheless the delay was not the fault of use plaintiff, as it was the responsibility of the defendants to supply the lumber.

5. In its memorandum opinion the district court stated that the percentages were determined on the basis of the testimony of Frank Gay to the effect that prior to termination of the subcontract the crews of C.D.G. were dividing their time on a basis of 25 per cent to pick up and 75 per cent to rework. Gay, who was hired by C.D.G. as a "pick up man", estimated that 75 per cent of the time was spent on rework for warpage and 25 per cent on regular pick up.

stantially is the actual cost of labor" and a reasonable amount for overhead. In its memorandum opinion the court computed the amount due C.D.G. as follows:

"COST OF COMPLETED UNITS at contract price:

| | | |
|---|---|---|
| 98 units at $875 | | $ 85,750.00 |
| COST OF UNCOMPLETED UNITS: | | |
| 22 units at contract price of $875 | $ 19,250.00 | |
| Less cost of completion | 8,000.00[6] | 11,250.00 |
| COST OF WORK PERFORMED UNDER THE CONTRACT | | $ 97,000.00 |
| COST OF THE EXCESSIVE WORK necessitated by the defendant Desert Builders' failure to supply materials when required: | | 67,667.39 |
| Total cost of project | $187,223.19 | |
| Cost of work performed under the contract | 97,000.00 | |
| Excessive cost | $ 90,223.19 | |
| Defendant's share of excessive cost | 75% | |
| | $ 67,667.39 | |
| Deposited in trust account | 15,000.00 | |
| Less Trustee's fee | 1,500.00 | 13,500.00 |
| TOTAL AMOUNT DUE PLAINTIFF | | $178,167.39 |
| Received by plaintiff | | 65,829.00 |
| TOTAL AMOUNT NOW DUE PLAINTIFF | | $112,338.39 |

Plaintiff shall be entitled to recover interest thereon from July 24, 1961, and its costs."

Appellants rely upon 27 specifications of error. Most relate to errors in the district court's findings of fact. From a careful review of the record, we find that there is substantial evidence to support all of the findings.

Appellant's argument is directed primarily to six alleged errors of the district court: (1) in allowing recovery for the reasonable value of labor performed in that appellee had by its action elected the remedy, if any, of damages for breach of contract; (2) in concluding that appellee had performed extra work beyond the scope of the contract; (3) in concluding that such rework as was performed by appellee was caused by the conduct of appellant; (4) in allowing recovery for appellee in that there was no proof of the reasonable value of the labor performed; (5) in concluding that appellee is entitled to pre-judgment interest; and (6) in denying recovery to appellant on its cross-complaint.

Appellants argue that as early as March 1961, (when C.D.G. contends Desert Builders failed to supply door frames and windows, with resulting warpage), C.D.G. had the right to re-

6. "The figure of $8,000 consists of $1,600, testified to by Clay Roberts as the cost of completing units, and adding to it that portion of excessive costs which the units were costing up to the time of the termination attributable to the plaintiff's failure and rounding it off to an even figure."

scind the contract, and not having done so, it elected to proceed until July 24, 1961, when the contract was terminated by Desert Builders. Relying upon City and County of San Francisco v. Transbay Const. Co., 9 Cir. 1943, 134 F.2d 468, appellants contend that by electing to proceed with the framing operations, C.D.G. elected the remedy of damages for breach of contract and may not now recover on the theory of reasonable value.

In Transbay, the court found that "the method of performance imposed on the contractor in the respects indicated was so unreasonable as to amount to a breach of contract" (134 F.2d at 472), whereupon the contractor might have rescinded, ceased work, and sued for the value of labor and materials furnished to the date of the breach. The contractor, however, notwithstanding the breach, completed its work. It was held that since the contractor elected to proceed with the contract and claim damages for its breach, the contract was not regarded as rescinded or abrogated, and "the recovery in quantum meruit goes only to the work performed in excess of that called for by the agreement." (134 F.2d at 473).

Continental Casualty Co. v. Schaefer, 9 Cir. 1949, 173 F.2d 5, was a Miller Act case in which the trial court found that the prime contractor had wrongfully breached the subcontract and induced the subcontractor to continue with the work and even to perform part of the work of the prime contractor. In holding that the subcontractor should be allowed to recover for the extra work in excess of the stipulated contract price, this court said in part: "Whether the theory is called implied-in-fact contract, quasi-contract or promissory estoppel, the measure of Schaefer's recovery against the Macris should be the reasonable value of the work and materials furnished plus overhead and profit." (Citing cases). (173 F.2d at 8).[7]

In B. C. Richter Contracting Co. v. Continental Casualty Co., 1964, 230 Cal. App.2d 491, 41 Cal.Rptr. 98, subcontractors, as here, sought recovery on the prime contractor's Capehart Act bonds. The subcontractors had a right to rescind after the cessation of certain progress payments, but elected to proceed with the contract and completed performance. On appeal they argued that they were entitled to recover on the basis of quantum meruit "unlimited by the contract price". The court held against this contention, but stated that the subcontractors' remedy was "to sue for the unpaid balance of the contract price plus extra costs caused by hindrances and delay". (41 Cal.Rptr. at 105). The court said in part:

"The Miller Act decisions, however, firmly establish the surety's liability for the extra cost of labor and material supplied to the project resulting from the prime contractor's breach, hindrance or default. (Citing cases). To the extent that plaintiffs are able to establish the contractor's liability for augmented costs of labor and materials attributed to the latter's default and hindrance, the defendant sureties are answerable." (41 Cal.Rptr. at 103).[8]

In both Schaefer and Richter the subcontractor completed the contract, as did the contractor in Transbay. Had C.D.G. been permitted to continue its subcontract to completion, it would have been entitled to recover the stipulated contract price and in addition the reasonable value of work performed in excess of the contract. Here, however, C.D.G. was pre-

7. Distinguishing Transbay the court called attention to the fact that in Transbay "the alleged extra work done was that which the plaintiff contracted to do, but it had become more burdensome due to unanticipated conditions," whereas in Schaefer the subcontractor performed work, not called for by the subcontract, at the request of the prime contractor.

8. See also Fanderlik-Locke Co. v. United States for Use of Morgan, 10 Cir. 1960, 285 F.2d 939, a Miller Act case, where it was held that the subcontractor was entitled to recover the reasonable value of additional services and materials furnished at the request of the prime contractor who received the benefit thereof.

vented from completing its contract by its wrongful termination by Desert Builders. Upon this breach, C.D.G. had an option to forego a suit for damages on the contract and claim the reasonable value of its performance.

■ The general rule in California (B. C. Richter Contracting Co. v. Continental Casualty Co., supra, at 41 Cal. Rptr. 103–104) allows election of remedies for breach of contract. It has been held frequently in accordance with this rule that a party furnishing labor and materials in part performance of a contract may elect to treat the contract as rescinded and sue on a quantum meruit for the reasonable value of services performed, if the other party terminates the contract and prevents its terms from being fulfilled. See e. g., McIntosh v. Funge, 1930, 210 Cal. 592, 292 P. 960, 74 A.L.R. 420.[9]

In United States for Use of Susi Contracting Co. v. Zara Contracting Co., 2 Cir. 1944, 146 F.2d 606 (cited by this court in Continental Casualty Co. v. Schaefer, supra), the subcontractor, as here, alleged that the prime contractor wrongfully terminated the subcontract and sought recovery for the reasonable cost and value of the work actually performed. The prime contractor, as here, took over the completion of the work and filed a counterclaim. The trial court found generally in favor of the subcontractor and made an award for work done at the contract rate and an additional amount for extra work. The court distinguished cases "limited to claims for extra work, where the contract has not been wrongfully terminated", and said in part:

"For it is an accepted principle of contract law, often applied in the case of construction contracts, that the promisee upon breach has the option to forego any suit on the contract and claim only the reasonable value of his performance. This is well settled in the New York cases. (Citing cases).

"It also appears to be the general view, save for an occasional case viewed as illogical by the text writers, who are solidly in support of the doctrine. (Citing cases).

"* * *

"* * * It is therefore appropriate here, particularly in default of any challenging evidence, to base recovery on proper expenditures in performance, (citing cases) or for extra work (citing case) and to make use of the contract as fixing the basic price." (146 F.2d at 610–611).

Appellants contend, however, that inasmuch as C.D.G. did not elect to rescind the contract upon the initial default of Desert Builders in failing to deliver windows in March, 1961, C.D.G. then made an election to continue with the contract, and "once an election is made, there would be no second chance, on the basis of a subsequent breach", i. e., Desert Builders' wrongful termination of the contract. No authority is cited for this contention. Neither logic nor California law support appellants' position.

■ The trial court found a series of defaults, delays, and hindrances on the part of Desert Builders between March, 1961, and June, 1961. All of them were waived by C.D.G. and it continued to perform under the contract.[10] The waiver by C.D.G. of any breach resulting from the delay in delivery of windows did not preclude an action for breach of the sub-

9. See also Walker v. Price, 1912, 163 Cal. 617, 126 P. 482; Blair v. Brownstone Oil & Ref. Co., 1917, 35 Cal.App. 394, 170 P. 160; Fatta v. Catalano, 1919, 41 Cal.App. 630, 183 P. 224. Cf. Oliver v. Campbell, 1954, 43 Cal.2d 298, 273 P.2d 15.

10. Whether the failure of Desert Builders to deliver windows in March, 1961, was a breach of the sort requiring an election of remedies on the part of C.D.G., we need not now decide. The wrongful termination of the subcontract in July, 1961, gave rise to a right of action and afforded C.D.G. with an election of remedies.

contract due to Desert Builders' wrongful termination or place any limitation upon C.D.G.'s right, at the time of the wrongful termination, to elect to rescind the contract and sue for the reasonable value of labor performed.

Nix v. Heald, 1949, 90 Cal.App.2d 723, 203 P.2d 847 is in point here. In that case plumbing subcontractors had entered into a written contract with a builder whereby the subcontractors agreed to do all necessary plumbing in 100 homes to be constructed by the builder. Due to the builder's delay in giving the subcontractors notice to commence performance, materials became unavailable and the subcontractors were unable to complete the work at the rate called for in the contract. The builder asserted the subcontractor to be in default and hired another plumber to complete the subcontract. The contractor subsequently sued to recover as damages the excess of the amount paid the new plumber for completing the installation over the price to have been paid under the contract. The subcontractor cross-complained for breach of contract. The lower court found for the subcontractor. In affirming, the appellate court stated:

"Appellants contend that respondents by commencing work under the contract waived any default of the builder caused by its tardy notification to commence performance. Admitting such contention, arguendo, yet respondents' waiver of one default did not concede to appellants the right subsequently to breach the contract by hiring another plumber. Nor would respondents' waiver of the builder's first default preclude respondents' action against the builder for a subsequent breach of the contract." (203 P.2d at 850).

Appellants' next three contentions in effect challenge the sufficiency of the evidence to support the court's findings and conclusions. We find no merit in their contention that C.D.G. did not perform any extra work beyond the scope of the contract. It is clear that a substantial amount of rework was required by reason of warpage resulting from Desert Builders' delays. We agree with the district court that there was an implied promise by Desert Builders to pay the reasonable value of the extra work and rework which they requested and which was performed by C.D.G.

In Fanderlik-Locke Co. v. United States for Use of Morgan, supra, the court held that repainting required of a subcontractor by reason of inadequate specifications and excess moisture in a low-quality wood was "not a condition of the subcontract, but additional work for which the prime contractor was responsible".[11] The same is true here. The rework was not required to meet the conditions of the subcontract. It was "extra work"—work "not contemplated by the parties".

Appellants next contend that there was no substantial evidence to support the conclusion that the rework was caused by the conduct of Desert Builders. No useful purpose would be served by a detailed discussion of the extended testimony relative to the warpage caused by the exposure of both loose lumber and lumber in place to the hot desert sun. While there was a conflict in the testimony, the evidence as a whole amply supports the findings of the district court that the warpage and subsequent rework were caused by Desert Builders' extended delays.

Appellants argue further that there was no substantial evidence in support of the court's findings as to reasonable value and that the conclusions and computations derived from the evidence are in error. In explaining the method of computing the amount of the award the court, in its memorandum opinion, said in part:

"The plaintiff * * * is entitled to recover from the defendant the reasonable value of labor performed.

11. See also United States for Use and Benefit of Warren Painting Co. v. J. C. Boespflug Construction Co., 9 Cir. 1963, 325 F.2d 54.

This includes the labor contemplated by the express language of the contract, and it also includes such additional labor as was required by the rework for which defendant's neglect was responsible. This rework was requested by the defendant and had to be done before plaintiff could be paid." * * *

"The plaintiff, therefore, should be entitled to recover the reasonable value of the labor performed on the project. In determining the reasonable value we might well take the cost of the labor and overhead and add a reasonable profit. But in this case it would appear that plaintiff's poor workmanship and inability to get top efficiency out of its crew was such that it was making no profit out of the job and would not have done so even if the contract had been completed without interruption. I find, therefore, that the plaintiff is not entitled to recover his profit."

There was detailed evidence of the actual costs incurred in the project, and the trial court found that the actual payroll and overhead were "necessarily and reasonably incurred to enable use plaintiff to provide the labor force for the project". In addition to extensive testimony, both parties introduced into evidence voluminous and detailed exhibits, including project progress reports and inspector's daily reports maintained by the Navy, payrolls showing the hours worked and amount and price of the labor, invoices of materials, photographs of the buildings at various stages, as well as charts and summaries prepared by the witnesses. The construction of these documents in the light of the testimony of the witnesses presented questions of fact for the trial court. We cannot say that any of the court's findings are erroneous or that the court made improper use of any of the figures and other information contained in the numerous exhibits.

In particular, there was evidence to support the trial court's finding that Desert Builders was responsible for 75 per cent of the "cost of all excessive work on the project".

The trial court awarded pre-judgment interest on the total amount found to be due from appellant. This award is challenged as erroneous. We agree in part with the appellants' position.

■ It is well settled under California law that pre-judgment interest is proper only in cases where damages are certain or capable of being made certain by calculation. Cal.Civ.Code, Section 3287; James Stewart Co. v. Dennett-Robertson Elec., Inc., 9 Cir. 1961, 291 F.2d 147; United States ex rel. Carter-Schneider-Nelson, Inc. v. Campbell, 9 Cir. 1961, 293 F.2d 816, cert. den. 368 U.S. 987, 82 S.Ct. 601, 7 L.Ed.2d 524. "The crucial question is not how the damages are calculated, but whether the debtor is able to compute them." McConnell v. Pacific Mutual Life Ins. Co. of Cal., 1962, 205 Cal.App.2d 649, 24 Cal.Rptr. 5, 11.

The district court found that $97,000 represented the cost of work performed under the contract. In our opinion the record supports this finding, and that the amount was ascertainable as a matter of mere multiplication. There must be deducted from this amount, however, the sum of $65,829 paid to C.D.G. on the contract price. This leaves $31,171 upon which interest may properly be allowed.

■ The $67,667.39 due for extra work represents 75 per cent of the total cost for all extra work performed by C.D.G. While the total figure representing all extra work may have been "capable of being made certain by calculation", the percentage of that figure for which the appellants were responsible was ascertainable only by judicial determination after a consideration of conflicting evidence. The amount due to appellee for extra work was uncertain and the award of pre-judgment interest thereon was improper.

The cause is remanded for recomputation of the amount due on the date of judgment by computing interest from

July 24, 1961, to the date of judgment on $31,171 instead of $112,338.39, and for amendment of the judgment accordingly. As so amended the judgment is affirmed.

The parties will bear their respective costs on this appeal.